# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DIVISION OF TEXAS
# BEAUMONT DIVISION

———————

No. 1:06-CV-458

———————

GATEWAY SENIOR HOUSING, LTD,
RICK J. DEYOE, GATEWAY SENIOR
HOUSING I, LLC

Plaintiffs

v.

MMA FINANCIAL, INC.,
ET AL.

Defendants

———————

### Memorandum Opinion Re Motions To Compel, For Sanctions And For Determination/Waiver Of Privilege

———————

This action is assigned to Chief United States District Judge Thad Heartfield who referred to the undersigned for decision the following three pending motions:

1. "Plaintiffs' Motion for Sanctions" (Docket No. 80);

2. "Plaintiffs' Motion to Compel and for Determination of Privilege and Waiver Under Rule 26(b)(5)(B) with Regard to October 11, 2005 E-mails" (Docket No. 82); and

3. Defendants' "Motion to Compel Production of Documents" (Docket No. 95).

All three motions are part and parcel of an ongoing dispute regarding the preservation, production and inspection of electronically stored and discoverable information. Deplorable lack of cooperation in discovery has fueled this dispute for almost two years. Court intervention is again necessary.

A fair resolution of the competing motions listed above requires the court to consider them in historical context. Thus, it is appropriate at the outset to give brief summaries of the nature of this action and how the dispute has unfolded to date.

## I. Nature Of Suit

Plaintiffs are Gateway Senior Housing, LTD, Rick J. Deyoe, and Gateway Senior Housing I, LLC (collectively "Gateway"). Defendants are MMA Financial, Inc., MMA Construction Finance, LLC, MMA Affordable Housing Group Trust, and MMA Mortgage Investment Corporation (collectively "MMA").

Gateway develops and manages senior housing projects. MMA provides construction and permanent financing for affordable housing and senior living communities. Gateway entered into a loan agreement with MMA to secure financing for a senior's apartment complex in Beaumont, Texas. Under the contract, MMA would provide a construction loan for the project, and upon completion of construction, would convert the temporary loan to permanent financing (the "Gateway transaction"). Gateway alleges that although it met all contractual requirements for conversion, MMA failed to convert the loan to permanent financing.

Gateway subsequently filed this suit for breach of contract. Jurisdiction is based on diversity of citizenship between all plaintiffs and all defendants, and is not contested.

## II. Disputes Regarding Electronically Stored Information

Discovery has been underway in this case since the fall of 2006. Under the court's original scheduling order, case specific disclosures and privilege logs were to be exchanged by December 1, 2006.

On February 1, 2007, MMA produced more than 4000 pages of documents in response to Gateway's request for production. These documents purportedly included all relevant e-mails concerning the Gateway transaction at issue.

### A. Original Motions To Compel And Subsequent Agreed Order

#### 1. How The Dispute Arose

Despite the copious quantity of produced documents, Gateway's counsel believed that important information was missing. Particularly, Gateway's counsel was not satisfied that it received certain "crucial" e-mails between and involving Bob Laird ("Laird") and Rex Tilley ("Tilley"). Laird was Asset Manager for MMA's Development Risk Management group. Tilley was Deputy Chief Underwriter for MMA.

In Gateway counsel's view, certain e-mail chains appeared to call for responses from Laird, but those responses were missing. Moreover, one of the documents produced was an internal document which the parties refer to as a "Synopsis from Kristi." It contains a time-line of events relating to the Gate-

way transaction that is at issue in this lawsuit.[1] It was sent as an attachment to an e-mail from Tilley to a lawyer, Greg DeMars, Esq., a partner in the law firm of Honigman Miller Shwartz & Cohn LLP in Detroit, Michigan. Counsel was suspicious because MMA did not disclose the e-mail that transmitted the synopsis from Kristi Nguyen-Romo to Tilley initially.

The Tilley-Laird e-mails were the subject of two motions to compel filed by Gateway in the spring of 2007. Gateway filed its first "Motion to Compel and for Determination of Privilege and Waiver Under Rule 26(b)(5)(B)" on April 10, 2007. (Docket No. 31). Gateway filed a "Supplemental Motion to Compel" on June 4, 2007. (Docket No. 48).

In wrangling over these motions, MMA claimed that the synopsis was a privileged attorney-client communication that had been inadvertently disclosed. MMA argued that the document was protected by the privilege because it was sent to an MMA attorney in connection with a request for legal advice. More precisely, the synopsis was included as an attachment to an e-mail sent by Tilley on June 12, 2006 to six other individuals, including Greg DeMars, who was part of MMA's "deal counsel" team in the underlying Gateway transaction. In support of its assertion of privilege, MMA submitted an affidavit from Tilley declaring *inter alia* that MMA's employees "*regularly seek legal advice from Mr. DeMars on behalf of [MMA] regarding anticipated, threatened, and ongoing litigation. Mr. DeMars has no business role with [MMA], and [MMA] employees do not have occasion to seek business advice from him.*"

---

[1] MMA employee Kristi Nguyen-Romo summarized the time-line of events relating to the Gateway transaction. Gateway characterizes the synopsis as "incriminating" and "damning" to MMA's position, because it supposedly confirms Gateway's allegations that MMA wrongfully delayed converting the construction loan to permanent financing. (Pl.'s First Mot. to Compel at 2).

Subsequent developments described below now precipitate a challenge to the truth of this declaration, and serve as one basis for Gateway's current motion for sanctions.

2. <u>How The Dispute Was Addressed</u>

In an effort to encourage the parties to cooperate in discovery and resolve these disputes without a heavy-handed judicial ruling, the court held a chambers conference on August 20, 2007, at which time it directed the parties to meet and confer regarding a search protocol for identifying and obtaining any additional electronically stored data at issue. In response, the parties filed an agreed proposal with the court.

The court accepted this proposal on October 31, 2007, and entered an "Agreed Order Confirming Protocol Agreement and Protective Order for Examination of Electronically Stored Data" (hereinafter "Agreed Order"). Therein, the court appointed an agreed-upon "E-Discovery Consultant," and authorized him to search for all e-mails relating to the Gateway transaction that were sent, received, stored or maintained by Laird and Tilley from August 1, 2005 through October 31, 2005. The order set forth a protocol by which the consultant would examine electronically stored data on MMA's computer network, and required that the consultant be permitted access to "*the processes and/or programs through which electronic mail data, including attachments, if any, were sent, received, stored, and maintained by Bob Laird and Rex Tilley from August 1, 2005, through October 31, 2005.*" It further provided that the e-discovery consultant "*shall have access to any electronic storage devices, including, but not limited to hard drives, servers, and back up tapes, containing e-mails for this period.*" Finally, paragraphs 14 and 16 of

the Agreed Order established a mechanism by which MMA was permitted to review any previously undisclosed e-mails located by the consultant in advance of their disclosure to Gateway in order to preserve and assert any applicable privilege.[2]

## B.  *Laird And Tilley Computer Hard Drives*

The Agreed Order required MMA to make computer hard drives available to the e-discovery consultant.  It proved to be ineffective with respect to both Laird's and Tilley's hard drives.  *After* the in-chambers conference wherein the parties were directed to formulate an electronic search protocol, but *before* the filing of the Agreed Order, MMA answered interrogatories, and claimed therein that Laird's hard drive was unavailable because his computer was infected by a virus *in 2006* and was either returned to Dell or reissued.  A caveat to that effect was in the Agreed Order, but nothing similar was disclosed with respect to Tilley's hard drive.  Nonetheless, MMA subsequently asserted that Tilley's hard drive also was unavailable.  When pressed for an

---

[2]    These paragraphs provided:

14.  The E-Discovery Consultant shall provide Defendants with any and all e-mails, including attachments, if any, to or from Bob Laird and to and from Rex Tilley, relating to the Gateway transaction, for the period August 1, 2005 through October 31, 2005.  Defendants will have twenty (20) days to review the documents and assert any applicable privileges with respect to the documents identified by the E-Discovery Consultant.  After Defendants' counsel review, Defendants' counsel will produce to Plaintiffs all non-privileged documents in hard-copy format.  In addition, Defendants shall provide Plaintiffs with a privilege log that comports with the requirements of Federal Rule of Civil Procedure 26(b)(5) as to any documents to which a claim of privilege is being asserted.  Plaintiffs reserve the right to challenge any claims of privilege, including the contention that any claims of privilege have been waived by non disclosure.

16.  After Defendants have made any applicable privilege claims or the expiration of twenty (20) days from the date of receiving the report from the E-Discovery Consultant, whichever is less, the documents that are not the subject of a claim of privilege will be disclosed and provided to Plaintiffs' counsel.

explanation, MMA responded only that Tilley's computer had developed "technical issues."

The e-discovery consultant subsequently carried out the remainder of his search, and issued a written report thereon. First, the consultant reported that MMA used a "Microsoft Exchange Server" e-mail system with "Store Vault" as its archiving software. He considered this archiving system as "virtually impossible to alter." As a result, he concluded confidently that the hard copy of the e-mails delivered to Gateway (those produced originally plus additional e-mails discovered by the consultant and discussed in the next section) "did constitute the entire body of e-mail communications between Mr. Tilley, Mr. Laird and others for the time periods in question *which utilized the MMA Exchange Server e-mail system*." (emphasis added). Second, according to the consultant (and contrary to previous assertions by MMA), it was possible for employees to save e-mails or other information on a computer's hard drive by using personal e-mail systems, such as AOL. Such data, if any, would have been recoverable had the consultant had access to the Laird and Tilley hard drives, but was not captured in the "Store Vault" archiving software. Third, the consultant confirmed that both Laird's and Tilley's hard drives had been "formatted," thereby destroying any information they may have contained.

In short, as a result of the consultant's efforts, Gateway now has all e-mails *captured by MMA's archiving software* to and from Laird and Tilley between August 1, 2005 through October 31, 2005. But to date, neither Laird's nor Tilley's computer hard drive – central to this discovery dispute – has been produced. Consequently, the court cannot determine whether *all* relevant e-

mails generated by Laird and Tilley are now in the hands of Gateway. Any business conducted on personal e-mail systems of either employee would not be stored on the Exchange Server Store Vault System.[3]

## C.  October 11, 2005 E-mails

The e-discovery consultant identified eighteen previously unproduced e-mails. Included in these were four e-mails between MMA employees and their "deal counsel," the aforementioned law firm of Mr. DeMars. The first e-mail, sent by MMA employee, Linda Cheers, provides an update on the status of MMA's business transaction with Gateway. In the second, deal counsel Roberta Russ, Esq., an attorney with the DeMars firm, responds and inquires whether she should "*stop all work or just proceed with title/survey?*" The third e-mail responds to the second, and directs deal counsel to "*stop all work for the time being but, if title and survey issues come up, address them.*" In the fourth, counsel Russ replies, "*I'll stop pushing this, but will pay attention to title/survey.*"

Following the protocol established in the Agreed Order, the consultant gave MMA a list of the eighteen previously undisclosed e-mails on April 29, 2008. MMA raised relevance objections to some, but did not object to disclosing any on the basis of privilege. Thus, hard copies of the remaining e-mails, including the four described above, were turned over to Gateway on May 20, 2008.

These e-mails appear innocuous to a casual observer. Gateway's counsel, however, perceived them as revealing that the DeMars law firm did in

---

[3]  In depositions, Laird and Tilley both testified that they each had personal e-mail accounts, but did not save any e-mails to their computer hard drives during the time period in question.

fact provide business advice contrary to the earlier sworn affidavit of Rex Tilley. Two days after receiving them, Gateway notified MMA that it intended to file a motion for sanctions based upon what counsel viewed as a material misrepresentation in MMA's earlier response to Gateway's original motion to compel (filed in 2007).

Hours after receiving notice of an impending motion for sanctions, MMA's counsel e-mailed Gateway's counsel, asserting that the October 11th communications were protected by the attorney-client privilege, and were inadvertently disclosed.

## III. The Pending Motions

### A. *Gateway's Motion For Sanctions*

Gateway's motion for sanctions alleges a "systematic and ongoing course of conduct" whereby MMA conceals and withholds relevant documents, and makes false representations to the court. The motion focuses primarily on the whereabouts of the hard drives of Laird and Tilley. Although Gateway's chief complaint is directed at MMA's failure to produce for inspection the hard drives of Laird and Tilley, as additional support, Gateway provides a litany of other related sanctionable conduct, including: (1) MMA's misrepresentations that certain e-mails did not exist; (2) sponsoring the allegedly false affidavit of Tilley regarding the role of outside counsel DeMars; and (3) misrepresenting the abilities of MMA's computer network.

Gateway seeks reimbursement for all attorneys' fees and expenses incurred in connection with its efforts to compel MMA to produce the documents that were withheld. It also seeks a court order requiring a mirror-im-

age of MMA's server drive, at MMA's expense, and all e-mail documents and other electronically stored data pertaining to the Gateway transaction from March 1, 2005 through July 31, 2006. Finally, Gateway seeks the imposition of any additional sanctions the court deems necessary against MMA and its attorneys.[4]

MMA, in turn, argues that Gateway was provided with everything requested, that DeMars was consulted for purely legal, non-business advice, and that it had no duty to retain any hard drives because the hard drives contained no relevant information.

## B.   Gateway's Motion To Determine Privilege And Waiver

Gateway requests that the court determine (1) whether the October 11, 2005, e-mails are privileged and, (2) if so, whether MMA waived any applicable privilege by withholding e-mails without listing them in any privilege log. Gateway argues that the e-mails are not privileged because they are not confidential communications requesting or giving legal advice regarding contemplated litigation, but rather constitute communications for purely business purposes related to closing the Gateway transaction. Alternatively, if the court determines that the e-mails are protected communications, Gateway argues that the court should find that MMA waived any privilege by failing to comply with its discovery obligations under the Federal Rules of Civil Procedure, the court's scheduling order, and the Agreed Order. More precisely, Gateway claims that MMA withheld the e-mails, but failed to divulge their existence in a privilege log for an extended period of time. Gateway argues

---

[4]      Gateway expressly excludes local defense counsel, Alex Stelly, Esq., from its request.

that the proper response to this failure is to consider any privilege in the October 11th e-mails waived.

MMA responds that these e-mails comprise obvious requests for legal advice, easily protected by the attorney-client privilege. As for waiver, MMA focuses its discussion on the short length of time (two days) that passed between the disclosure of the e-mails by the e-discovery consultant and MMA's assertion of the privilege. MMA does not address its failure (over the course of 18 months) to list the e-mails in any earlier privilege log.

## C. *MMA's Motion To Compel*

MMA seeks to compel Gateway to produce (1) for inspection, the computer hard drives of several Gateway document custodians, and potentially, back-ups for inspection by a neutral third-party e-discovery consultant; (2) materials relating to correspondence and dealings with Gateway's property manager, insurer, auditor, replacement lender, and equity provider; and (3) a privilege log with information sufficient for MMA to evaluate Gateway's assertions of privilege. MMA filed this motion on August 8, 2008, two months after Gateway filed its motions for sanctions and to compel discovery. The basis for MMA's motion rests upon Gateway's allegedly deficient document production. Specifically, MMA complains that Gateway's document production is littered with inexplicable blank pages, missing e-mail attachments and a complete absence of internal e-mail, which, according to MMA, calls into question the completeness of their document production and responses to discovery as a whole.

Gateway responds that MMA's motion to compel is entirely baseless and filed in bad faith in retaliation for Gateway's pending motions for sanc-

tions and to compel. Gateway's opposition meticulously addresses each and every complaint raised by MMA. Gateway asserts that blank pages were due to the manner in which Gateway employees and counsel copied documents, i.e., by using blank sheets of paper to separate them, or because the copy machine pulled through extra sheets of paper. Gateway asserts that all requested internal e-mail was in fact produced, and that there was not a tremendous amount of internal e-mail correspondence because Gateway is a small office. In addition, Gateway asserts that some e-mails did not have corresponding attachments, but that when a given e-mail did have an attachment, it was produced. Finally, Gateway argues that MMA never specifically requested materials relating to correspondence and dealings with Gateway's property manager, insurer, auditor, replacement lender, and equity provider either from Gateway or any of these third parties, nor did it address these requests in a conference as required by Local Rule CV-7(h).

Nevertheless, Gateway asserts that it has provided MMA with this third-party information. In support, Gateway filed with the court proof of MMA's complaints, Gateway's explanations, its corresponding category (i.e. whether it constitutes material relating to MMA's property manager, insurer, auditor, replacement lender, or equity provider), and where the documents could be found, identifying each by Bates-stamp number.

## IV.  Applicable Law

### A.  *Sanctions*

Pursuant to their inherent power to control the judicial process, federal trial courts may impose sanctions against parties for abusive litigation practices undertaken in bad faith. Chambers v. NASCO, Inc., 501 U.S. 32, 43

(1991); <u>Toon v. Wackenhut Corrections Corp.</u>, 250 F.3d 950, 952 (5th Cir. 2001). A court must, however, proceed with caution when invoking its inherent power, and "it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 50 (1991) (<u>citing</u> <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 767 (1980)).

Although federal courts may resort to their inherent sanction powers, when sanctionable conduct specifically is addressed under the federal rules of procedure, they should ordinarily "rely on the rules rather than the inherent power" if there is bad faith misconduct that can adequately be sanctioned under the rules. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 50. Rule 37 of the Federal Rules of Civil Procedure authorizes a district court to issue sanctions against a party for failing to comply with a court order. Fed. R. Civ. P. 37(b). The sanctions available include "an order striking out pleadings or parts thereof, dismissing an action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." <u>ClearValue v. Pearl River Polymers, Inc.</u>, 242 F.R.D. 362, 374 (E.D. Tex. 2007); <u>see</u> Fed. R. Civ. P. 37(b)(2)(A). The rule also directs courts to award expenses, including attorney's fees, in some situations:

> Instead of or in addition to [other enumerated sanctions], the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2)(C).

B.    *Spoliation Of Evidence*

While Rule 37 represents a significant enforcement power to punish discovery misconduct, it does not represent the "universe of potential discovery abuse."  Gregory P. Joseph, <u>Sanctions: The Federal Law of Litigation Abuse</u> § 26(E)(3) (4th ed. 2008).  "Wrongful destruction or loss of documents or other evidence is conduct of a kind that ordinarily falls outside the scope of Rule . . . 37, but is sanctionable under the court's inherent power." <u>Id.</u>; <u>see</u> <u>Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.</u>, 982 F.2d 363, 368 (9th Cir. 1992).

"Spoliation is 'the destruction of evidence . . . or the significant and meaningful alteration of a document or instrument.'"  <u>Escobar v. City of Houston</u>, 2007 WL 2900581, No. 04-1945, at *17 (S.D. Tex. Sept. 29, 2007) (quoting <u>Andrade Garcia v. Columbia Med. Ctr.</u>, 996 F. Supp. 605, 615 (E.D. Tex. 1998)).  When a party with an obligation to retain or preserve evidence fails to do so, and acts with culpability, a district court may impose sanctions. <u>Escobar v. City of Houston</u>, 2007 WL 2900581, No. 04-1945, at *17 (S.D. Tex. Sept. 29, 2007); <u>see generally</u> <u>Zubulake v. UBS Warburg, LLC</u>, 220 F.R.D. 212 (providing a detailed discussion of a party's duty to preserve evidence and the district court's authority to sanction a party for willful spoliation of evidence) (S.D.N.Y. 2003)).  "'The obligation to preserve evidence arises when the party has notice that the evidence is relevant to the litigation or when a party should have known that the evidence may be relevant to future litigation.'" <u>Escobar v. City of Houston</u>, 2007 WL 2900581, No. 04-1945, at *17 (S.D. Tex. Sept. 29, 2007) (quoting <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. at 216)).

A discretionary adverse inference instruction is the classic sanction for spoliation of evidence. Such instruction "is proper when a party has deliberately destroyed evidence or has failed to either produce relevant evidence or explain its non-production." McMillin v. State Farm Lloyd's, 180 S.W.3d 183, 199 (Tex. App.– Austin 2005) (citing Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 721 (Tex. 2003)). A party seeking an adverse inference instruction or other sanction in connection with the destruction of relevant evidence must establish that the party with control over the evidence had a duty to preserve the evidence and that it was destroyed in "bad faith." King v. Ill. Cent. RR., 337 F.3d 550, 556 (5th Cir. 2003) (citing United States v. Wise, 221 F.3d 140, 156 (5th Cir. 2000)); Zubulake v. UBS Warburg, LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004).

## C. Determinations Of Privilege And Waiver

### 1. Attorney-Client Privilege

"The attorney-client privilege shields confidential communications between an attorney and client made for the purpose of furnishing or obtaining professional legal advice and assistance." In re LTV Sec. Litig., 89 F.R.D. 595, 599-600 (N.D. Tex. 1981); see also, Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co., 953 F.2d 1004, 1007 (5th Cir. 1992) (citing United States v. El Paso Co., 682 F.2d 530, 538 (5th Cir. 1982), cert denied, 466 U.S. 944 (1984). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The burden of establishing the attorney-client privilege always rests on the party claiming it. United States

v. Rodriguez, 948 F.2d 914, 916 (5th Cir. 1991); <u>Tyne v. Time Warner</u>, 212
F.R.D. at 599; <u>Southern Bell v. Deason</u>, 632 So.2d at 1383.

In diversity cases where state law supplies the rule of decision, claims
of attorney-client privilege are determined in accordance with the law of the
forum State. Fed. R. Evid. 501; <u>In re Avantel, S.A.</u>, 343 F.3d 311, 318 n.6 (5th
Cir. 2003); <u>Miller v. Transamerican Press</u>, 621 F.2d 721, 724 (5th Cir. 1980).
Under the law of the forum (Texas), claims of attorney-client privilege are
determined by the law of the state with the most significant relationship to
the communication. <u>Ford Motor Co. v. Leggat</u>, 904 S.W.2d 643, 647 (Tex.
1995). Here, the e-mails were sent by MMA employees in Florida. Moreover,
"Texas Courts have held that the state where the communication took place is
the state with the most significant relationship." <u>Gonzalez v. State</u>, 21
S.W.3d 595, 597 (Tex. App. - Houston 2000). Therefore, Florida law will de-
termine whether the October 11th e-mails are privileged attorney-client com-
munications. <u>Id.</u>; <u>see</u> <u>also</u> <u>Nance v. Thompson Med. Co.</u>, 173 F.R.D. 178, 181
(E.D. Tex. 1997) ("Claims of attorney-client privilege are governed by the law
of the state where the communication was made.").

In Florida, the attorney-client privilege applies to confidential commu-
nications made "in furtherance of the rendition of legal services to the client."
Fla. Stat. § 90.502(1)(c) (2008); <u>Southern Bell Tel. & Tel. Co. v. Deason</u>, 632
So.2d 1377, 1380 (Fla. 1994). Consequently, the privilege does *not* apply
"where a lawyer is engaged to advise a person as to business matters as op-
posed to legal matters, or when he is employed to act simply as an agent to
perform some non-legal activity for a client." <u>Skorman v. Hovnanian of Fla.,
Inc.</u>, 382 So.2d 1376, 1378 (Fla. 4th DCA 1980); <u>see</u> <u>Tomkins Indus., Inc. v.</u>

Warren Tech., Inc., 768 So.2d 1125, 1126 (Fla. 3d DCA 2000) (finding the record sufficient to show a letter from corporate counsel to corporate employees was for the purpose of rendering legal advice as opposed to business advice); cf. Simon v. G.D. Searle & Co., 816 F.2d 379, 404 (8th Cir. 1987) ("Client communications intended to keep the attorney apprised of business matters may be privileged if they embody 'an implied request for legal advice based thereon.'" (quoting Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44, 46 (N.D. Cal. 1971))).

In addition, Florida's Supreme Court has established specific factors that are used to determine when a corporation's communications are protected by the attorney-client privilege. Southern Bell, 632 So.2d at1380. Those factors, applicable here, are:

(1) the communication would not have been made but for the contemplation of legal services;

(2) the employee making the communication did so at the direction of his or her corporate superior;

(3) the superior made the request of the employee as part of the corporations effort to secure legal advice or services;

(4) the content of the communication relates to the legal services being rendered, and the subject matter of the communication is within the scope of the employee's duties;

(5) the communication is not disseminated beyond the persons who, because of the corporate structure, need to know its contents.

<u>Southern Bell</u>, 632 So.2d at1380; <u>Tyne v. Time Warner Entm't Co.</u>, 212 F.R.D. 596, 599 (M.D. Fla. 2002); <u>The St. Joe Co. v. Liberty Mut. Ins. Co.</u>, 2006 U.S. Dist. LEXIS 85260, at *14-15 (M.D. Fla. Nov. 22, 2006).

2.  <u>Waiver</u>

Gateway claims that by withholding the October 11th e-mails without listing them in its privilege log MMA waived any related privilege claims. The Federal Rules require that when a party withholds information based on a claimed privilege, the other party must be properly notified.  Fed. R. Civ. P. 26(b)(5)(A).  Rule 26(b)(5)(A) describes what notice is required:

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> (I)  expressly make the claim; and
>
> (ii)  describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A).

Furthermore, the advisory committee note to Rule 26(b)(5) explicitly warns that waiver of the attorney-client privilege is a possible result of failing to provide proper notice in a privilege log: "[t]o withhold materials without such notice is contrary to the rule . . . and may be viewed as a waiver of the privilege or protection."  Rule 26(b)(5) Advisory Committee's Note (1993

Amendments); <u>Burlington Northern & Santa Fe R.R. v. U.S. Dist. Ct.</u>, 408 F.3d 1142, 1147-48 (9th Cir. 2005), cert. denied by 546 U.S. 939 (2005).

On this basis, courts in this district (and across the country) recognize that when a party fails to state a privilege objection in the privilege log, waiver of the attorney-client privilege can occur. <u>Robinson v. Tex. Auto. Dealers Ass'n.</u>, 214 F.R.D. 432, 456 (E.D. Tex. 2003) (Schell, J.), rev'd on other grounds by 387 F.3d 416 (5th Cir. 2004) (finding that defendants waived the attorney-client privilege, the joint defense privilege, and the work product protection by failing to list documents in their privilege log); <u>Nance v. Thompson Med. Co.</u>, 173 F.R.D. 178, 182 (E.D. Tex. 1997) (McKee, J.) (referencing the advisory committee note in support of this waiver principle); <u>Mackey v. IBP, Inc.</u>, 167 F.R.D. 186, 200 (D. Kan. 1996) (deeming the attorney-client privilege waived where a party failed to give proper notice of withheld information); <u>see</u> <u>Burlington Northern</u>, 408 F.3d at 1147-48 (9th Cir. 2005) (citing the advisory committee note, and holding that the district court did not err in finding of waiver where defendant filed a privilege log five months after the Rule 34 time limit); <u>Dorf & Stanton Commc'ns, Inc. v. Molson Breweries</u>, 100 F.3d 919, 923 (Fed. Cir. 1996) (refusing to issue writ of mandamus where trial court concluded that the privilege was waived because the party "failed to provide a complete privilege log demonstrating sufficient grounds for taking the privilege"); <u>see</u> <u>also</u> <u>Peat, Marwick, Mitchell & Co. v. West</u>, 748 F.2d 540, 542 (10th Cir. 1985) (per curium) (same); <u>Flanagan v. Benicia Unified Sch. Dist.</u>, 2008 WL 2073952, at *5, 2008 U.S. Dist. LEXIS 39386, at *13-14 (E.D. Cal. May 14, 2008).

Waiver of the attorney-client privilege does not automatically and necessarily result from noncompliance with Rule 26(b)(5). <u>United States v. Philip Morris, Inc.</u>, 347 F.3d 951, 954 (Fed. Cir. 2003) (<u>citing</u> <u>First Sav. Bank, F.S.B. v. First Bank Sys., Inc.</u>, 902 F. Supp. 1356, 1361 (D. Kan. 1995)). "[W]aiver of a privilege is a serious sanction most suitable for cases of unjustified delay, inexcusable conduct, and bad faith." <u>Id.</u>  However, imposing such a sanction for failing to provide proper notice in a privilege log serves an important purpose. The Honorable Richard Schell explained this purpose in <u>Robinson v. Tex. Auto. Dealers Ass'n.</u>, 214 F.R.D. 432, 456 (E.D. Tex. 2003):

> While waiver based on such conduct may seem like a harsh penalty, such a policy is necessary to prevent gamesmanship.  If a party is allowed to withhold documents without giving opposing parties notice that the documents exist but are being withheld, the opposing party will obviously be unable to contest the validity of a privilege or protection asserted for those documents.

## D.  Discovery Scope And Limits

Federal Rule of Civil Procedure 26 imposes on parties a duty to disclose, without awaiting formal discovery requests, a wealth of information needed in most cases to prepare for trial or make an informed decision about settlement.  The clear intent of Congress when enacting voluntary disclosure rules was "to accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information."  Rule 26(a) Advisory Committee's Note (1993 Amendments). Indeed, parties generally cannot engage in formal discovery until after the court has adopted or established an approved discovery plan.  Fed. R. Civ. P. 26(d); <u>see</u> <u>also</u> Cer-

tain Underwriters at Lloyd's v. Frichelle, Ltd., 1996 WL 125957, No. 96-549, at *1 (E.D. La. Mar. 20, 1996).

When court-supervised discovery is necessary, parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1). Local Rule CV-26(d) provides guidance as to what judges within this district deem as being relevant to a claim or defense. Loc. R. CV-26(d). Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1).

All discovery, however, is subject to limitations imposed by Rule 26(b)(2)(C). Additionally, the court may, for good cause, issue an order protecting a party or person from annoyance, embarrassment, oppression or undue burden or expense, and may award expenses to reimburse the protected party or person for having had to seek the protection of the court. Fed. R. Civ. P. 26(c); see Bat v. A.G. Edwards & Sons, Inc., 2006 WL 446078, No. 04-CV-02225-REB-BNB, at *2 (D.C. Colo. Feb. 21, 2006) (denying motion to compel that was filed for an improper purpose); cf. Javelin Invs., LLC v. McGinnis, 2007 WL 1003856, No. H-05-3379, at *3 (S.D. Tex. Mar. 30, 2007) (scolding parties for engaging in tit-for-tat discovery tactics); Burkart v. City of New Orleans, 1988 WL 54767, No. 87-4291, at *4 (E.D. La. 1988) (admonishing plaintiffs for filing a motion simply in response to a similar motion by defendants).

## V.   Application And Analysis

A hearing on the three motions enumerated at the outset and described in Section III was conducted on October 21, 2008. Counsel for Gateway and

MMA appeared, and were permitted to present oral arguments and evidence supporting their respective positions. From the oral and written arguments, it is clear that Gateway contends that MMA's conduct regarding the October 11th e-mails warrants a court decree that MMA has waived any privilege that it might otherwise assert with respect thereto, and that such conduct is but one component of a systematic and ongoing course of discovery misconduct. For analytical convenience, therefore, the privilege/waiver issue is addressed first.

*A. Privilege: Not Proven; Alternatively, Waived*

    1.  <u>MMA Has Not Carried Its Burden Re Privilege</u>

Gateway challenges MMA's assertion of privilege, contending that the October 11th e-mails were sent for business purposes, not "in contemplation of legal services." (Pl.'s Mot. at 8; Pl.'s Reply at 4). MMA takes the opposite position, arguing that the e-mails "consist of quintessential requests for legal advice." (Def.'s Resp. at 3). Despite the parties' confident (and tactical) pronouncements, the specific purpose and meaning of the e-mails is not clear from their text.

The e-mails in question concern routine title and survey issues related to the Gateway transaction. It is unclear whether they amount to confidential communications between an attorney and client made for the purpose of furnishing or obtaining professional legal advice and assistance regarding threatened or contemplated litigation, and there is no basis for a plausible inference to that effect. In October 2005, litigation between Gateway and MMA was not anticipated or threatened. Their business relationship was ongoing and healthy.

Obviously, lawyers usually are retained to provide legal services, but such is not necessarily the case with "deal counsel," and the texts of the October 11th e-mails are not self-explanatory. None includes legal questions, advice, or opinions, and none discusses any legal issues. Rather, each contains language that could indicate either legal or business services. Finally, it is equally unclear what Russ meant when she wrote: "I'll stop pushing this, but will pay attention to title/survey."

The significance of these messages was understood by those individuals involved in their exchange. However, any outside entity (like this Court), can only guess as to the precise meaning of general terms like "all work" and "title/survey." MMA directed its deal counsel to suspend work. But, the nature of that work is not revealed by the text of the e-mails, and MMA has supplied no extrinsic facts to put the text of the e-mails in context, or otherwise support its claim that the e-mails referred to confidential legal advice. MMA does not describe what work the attorneys performed; nor what work they suspended. Instead, the discussion of Florida's five-factor privilege test (set forth above) in MMA's briefing consists of several one-sentence, self-serving conclusions like: "Cheers specifically sent the Legal Directive E-mails seeking not business advice, but providing specific directives for legal advice." (Def.'s Resp. at 5). MMA does not support these conclusory statements with any specific facts. Such conclusory statements are insufficient to carry MMA's burden of proving that the e-mails are privileged.

At the Court's October 21, 2008 hearing, MMA's counsel had another opportunity to insert probative details. But, instead of doing so, counsel continued to rely on *ipse dixit* assertions that the e-mails were obvious requests

for legal advice. As previously stated, that quality is not obvious. MMA did nothing at the October 21, 2008 hearing to clarify the e-mails or bolster its claims of privilege.

In summary, MMA correctly points out that attorneys provide valuable legal services in closing business deals. But, MMA seems to ignore that, in addition to legal advice, attorneys also "frequently give to their clients business or other advice that . . . gives rise to no privilege whatever." Colton v. United States, 306 F.2d 633, 638 (2d Cir. 1962), cert. denied, 371 U.S. 951 (1963); J.P. Foley & Co. v. Vanderbilt, 65 F.R.D. 523, 526-27 (S.D.N.Y. 1974) (where an attorney acts as a negotiator or business agent for the client, confidential communications between them are not privileged). Plainly, an attorney can act as a legal agent, a business agent, or a combination of the two in any business transaction. What is not clear is the precise role that attorneys DeMars and Russ played in this particular e-mail exchange, in connection with this particular Gateway transaction.

Consequently, MMA fails to show that the e-mails would not have been sent but for the contemplation of legal services, and fails to carry its burden of establishing that the attorney-client privilege applies to the October 11, 2005 e-mails.

2. MMA Waived Any Privilege

Assuming *arguendo* that MMA made the requisite showing that the October 11th e-mails were protected by the attorney-client privilege, Gateway argues for that privilege to be deemed waived, as an appropriate sanction for MMA's failure to comply with its discovery obligations. As previously stated, when a party withholds a document without stating a privilege objection in

the privilege log, waiver of the attorney-client privilege can occur. <u>Robinson v. Tex. Auto. Dealers Ass'n.</u>, 214 F.R.D. at 456. Here, Gateway contends that MMA waived any related privilege claims by withholding the e-mails from late 2006 until their casual, inattentive and now-claimed-inadvertent disclosure in May 2008. For the reasons given below, the court agrees.

MMA's long delay is disturbing. Under the court's original scheduling order, MMA's privilege log was due December 1, 2006. (Docket No. 17). MMA provided a privilege log on December 5, 2006, and supplemented it twice on March 22, 2007 and April 6, 2007. However, MMA never included the October 11th e-mails in any privilege log, and never produced them at any time during discovery. In fact, the e-mails were not produced until the court-appointed e-discovery consultant turned them over to Gateway on May 20, 2008.

Prior to that May 20th disclosure, MMA had a *fourth* opportunity to list the October 11th e-mails in a supplemental privilege log. Again, it failed to do so. Under the court's Agreed Order on e-discovery, MMA had twenty days from the day the consultant gave MMA a list of the located e-mails to review them and assert any privilege claims in a privilege log. But, after completing this review, MMA still did not claim any privilege.

Furthermore, MMA has not offered any explanation as to why it waited eighteen months before making a claim of privilege. While it was mid-2008 before the e-discovery consultant uncovered the e-mails, MMA has not claimed that the e-mails were unavailable or unknown to MMA prior to that time. Rather than address its severe delay in giving proper notice of the e-mails, MMA points to its punctuality in claiming privilege two days after the

e-discovery consultant disclosed the e-mails. Such promptness would be rele-
vant if the court were determining waiver based on inadvertent disclosure.
But, Gateway does not advocate waiver based on inadvertent disclosure, and
the court does not analyze the motion on the premise that the allegedly inad-
vertent disclosure is a ground for waiver.[5]

Reviewing a trial court's declaration of waiver in <u>Dorf & Stanton</u>
<u>Commc'ns, Inc. v. Molson Breweries</u>, 100 F.3d 919, 923 (Fed. Cir. 1996), the
Federal Circuit described circumstances similar to those now before this
court:

> This is not a case where a party inadvertently omitted documents
> from its privilege log and is getting 'nailed' for its inadvertence.
> It also is not a case where a party merely failed to comply with
> what it asserts are technicalities of a demanding [rule]. Rather it
> is a case where a party failed to meet the requirements of a valid
> [rule], failed to treat related documents consistently, and then
> failed to use its best efforts to cure the problems created by its
> first two failures until it was too late, coming in with full throttle
> only after a crash was imminent.

---

[5]     If inadvertent disclosure were at issue, waiver of the privilege
would be determined according to Florida law.  See In re Avantel, S.A., 343 F.3d
311, 323 (5th Cir. 2003) (stating that when state law supplies the rule of the
decision, it also determines questions of privilege-including whether the
privilege has been waived by disclosure); see also Hyde Const. Co. v. Koehring
Co., 455 F.2d 337, 340-42 (5th Cir. 1972).  However, Gateway does not argue that
MMA waived the attorney-client privilege by disclosing the e-mails.  Instead,
Gateway focuses on MMA's failure to comply with its discovery obligations under
the Federal Rules of Civil Procedure and this court's scheduling order.  As such,
the court determines the issue of waiver based on federal standards.  See Eureka
Fin. Corp. v. Hartford Accident & Indem. Co., 136 F.R.D. 179, 182 n.5 (E.D. Cal.
1991) (stating that while state law governs substantive privilege questions in
a diversity action, "it hardly needs mentioning that the procedure for responding
to discovery requests in federal court litigation, including the procedure for
proper assertion of a privilege, is governed by federal law).

MMA unjustifiably delayed in disclosing the existence of the October 11th emails. This unjustified (and unexplained) delay is a serious violation, deserving of a serious sanction. Accordingly, the court deems MMA to have waived any attorney-client privilege it may have in the October 11th e-mails. See Robinson v. Tex. Auto. Dealers Ass'n., 214 F.R.D. at 456; Mackey v. IBP, Inc., 167 F.R.D. at 200.

B.  *Sanctions For Withholding Laird And Tilley Hard Drives*

The court, after conducting a hearing and reviewing the pleadings and submissions in this case, is of the opinion that MMA's conduct is not the pervasive, systematic, and egregious conduct with respect to discovery that Gateway advocates. The "death penalty" sanctions of entry of default judgment or striking of pleadings or defenses, therefore, are not warranted. MMA has, however, engaged in sanctionable conduct with regard to the Laird and Tilley hard drives.

The Agreed Order required MMA to provide access to the Laird and Tilley hard drives. Despite obvious notice of a duty to preserve this evidence – i.e., this pending litigation, a long history of dispute surrounding communications made by Laird and Tilley, and the Agreed Order – MMA nonetheless allowed both hard drives to become unavailable. MMA's proffered explanation that the Laird hard drive became infected with a virus in 2006 and was either returned to Dell or reissued is unconvincing. First, MMA floated this excuse for the first time in 2007, only after the court directed the parties to meet and confer to formulate an electronic search protocol. Second, Laird himself testified that his computer's hard drive was not infected with any viruses in 2006, and was never returned to Dell or reissued. Third, MMA's

vague and even later excuse of being unable to produce the Tilley hard drive due to unspecified "technical issues" is even more lame. Finally, the e-discovery consultant's determination that both hard drives had been formatted – thus rendering them unsusceptible to meaningful forensic examination in any event – leads the court to conclude that MMA engaged in purposeful destruction of evidence.

The bottom line is that neither hard drive has been made available for inspection, and upon consideration of the fact that Laird and Tilley were the MMA employees directly responsible for handling the Gateway transaction, the court finds it incredible that both hard drives of these two key employees would – during litigation – suddenly become sick and unavailable. Laird and Tilley were both sophisticated managers, and it is neither fanciful nor delusional to harbor a suspicion that they could circumvent MMA's Exchange Server Store Vault System by communicating via personal e-mail accounts were they so inclined. Accordingly, the court finds that MMA's failure to produce their computer hard drives constitutes willful destruction of evidence and a bad faith failure to comply with the court's order to produce.

Accordingly, a sanction for spoliation of evidence and for failure to comply with a court order is appropriate. The court concludes that an appropriate sanction includes a discretionary adverse inference that the missing hard drives contain evidence unfavorable to all defendants. That the trier of fact will have the prerogative to make such adverse inference does not necessarily mean that it will. That decision must be made at trial, and in view of the evidence as a whole, particularly Laird and Tilley's unequivocal, albeit inter-

ested, testimony that they never saved e-mail messages to their computer hard drives.

The court further concludes that an appropriate and just sanction should include an award of reasonable expenses and attorney fees associated with bringing Gateway's motions to compel, for determination of privilege and waiver, for sanctions, and for responding to MMA's improper motion to compel (discussed next).[6]

## C.  Denial Of MMA's Motion To Compel

MMA's competing motion to compel technically is not late because discovery has not yet closed under the court's most recent, i.e., its *sixth* scheduling order.  However, the timing of the motion is egregiously late under any pragmatic view.  Simply put, if MMA really wanted this information, if it genuinely viewed the information as something that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate or try a claim or defense, it would have been requested long ago, at least a year earlier, and then promptly followed up with a motion to compel at that time.

Further, MMA's motion is almost a mirror image of Gateway's motion to compel; it was submitted only after the Gateway motion was filed; it was

---

[6]     The court does not embrace Gateway's view that an appropriate monetary sanction is an award for all attorney's fees and expenses incurred from the outset in seeking to compel documents.  Rather, a measured and temperate sanction must be limited to fees and expenses incurred in bringing and responding to the instant motions.  The court concludes that a reasonable sum does not exceed $3,500.00.

      The court further does not agree that relief in the form of a court order requiring a mirror-image of MMA's server drive, at MMA's expense, and all e-mail documents and other electronically stored data pertaining to the Gateway transaction from March 1, 2005 through July 31, 2006, is warranted.  Although this relief was requested, it was not argued in Gateway's oral or written arguments.  Nor does it appear appropriate in any event.  Given the e-discovery consultant's certification that MMA has produced all electronically-stored data on MMA's server drive for the relevant time period, the court perceives no constructive purpose in granting Gateway's request.

filed without first making a *specific* formal request to produce documents involving transactions with Gateway's property manager, insurer, auditor, replacement lender, and equity provider; and it was filed without clear compliance with the 'meet and confer' requirements with regard to these same documents.

Conversely, Gateway has provided MMA with a detailed, comprehensive and entirely satisfactory set of responses to each suggestion of deficient document production. This circumstance and the facts recited in the preceding paragraph prompt the court to conclude that MMA is engaging in this instance in improper *tant pour tant* discovery gamesmanship by filing a reciprocal and retaliatory motion to compel. Accordingly, the court will exercise its discretion to protect Gateway from abusive and oppressive discovery by denying the motion, and will award reasonable fees and expenses as a sanction. [See note 6, supra.]

## VI.  Conclusion

For the reasons stated above, the court will (a) grant Gateway's motion for sanctions in part, (b) grant Gateway's motion to determine privilege and waiver regarding the October 11, 2005 e-mails, and (c) deny MMA's motion to compel. An order to such effect is entered simultaneously with the issuance of this memorandum opinion.

SIGNED this __4__ day of December, 2008.

*Earl S. Hines*

Earl S. Hines
United States Magistrate Judge